DOMENGEAUX, Judge.
Sally Migues Hebert commenced these proceedings on behalf of herself and on behalf of Brett Hebert and Nicole Hebert, her minor children, seeking worker’s compensation death benefits pursuant to La.R. S. 23:1231 (1950) (amended 1956, 1968,1975 and 1980)[1] for the death of her husband, Timothy Childs Hebert. Hebert named as the defendants: (1) Harbert International, Inc. (Harbert), Timothy Herbert’s employer at the time of his death; and (2) United States Fidelity & Guaranty Insurance Company (U.S.F. & G.), Harbert’s worker’s compensation insurance carrier.
The Trial Court concluded that Timothy Hebert died as the result of a personal injury by accident that rose out of and in the course of his employment with Harbert. Judgment was rendered in accordance with La.R.S. 23:1232 (1950)[2] and La. R.S. 23:1233 (1950) (amended 1975),[3] in fa *1213 vor of Hebert, individually and on behalf of her minor children, and against Harbert and U.S.F. & G. The judgment awarded the plaintiff worker’s compensation benefits in the amount of $260.00 per week from June 20, 1986. Sally Hebert was decreed entitled to the compensation benefits until her death or remarriage and if terminated by remarriage she was decreed entitled to receive a lump sum payment equal to two years benefits. The minor children were decreed entitled to compensation benefits until their death, marriage or until they reached the age of majority. The children were also awarded the right to continue to receive compensation benefits beyond the age of majority should they enroll and attend an accredited educational institution. The children’s benefits are to cease, irrespective of their educational endeavors, at the age of twenty-three. Har-bert and U.S.F. & G. were additionally ordered to pay all hospital and medical expenses and all funeral expenses not exceeding $3,000.00.
Harbert and U.S.F. & G. sought this review and have assigned two errors. The appellants contend:
(1) The Trial Court, although applying the proper standard, personal injury by accident arising out of and in the course of the employment, erred in applying the standard to the facts surrounding Hebert’s death; and
(2) The Trial Court erred in concluding that the physical exertion, stress and strain endured by Hebert during his employment was greater than the exertion, stress and strain involved in everyday nonemployment activity.
Timothy Hebert began working for Har-bert as a fitter on Monday, June 16, 1986, subsequent to a six month period of unemployment resulting from a layoff. Hebert’s workday at Harbert began at 7:00 a.m. and concluded at 5:30 p.m. He had a thirty minute lunch break at noontime and two fifteen minute breaks at approximately 9:00 a.m. and 3:00 p.m.
On Wednesday, June 18,1986, at approximately 4:20 in the afternoon, Hebert experienced a left frontal intracerebral clot suspected to have been caused by a ruptured aneurysm, a weakness in an artery, or a ruptured blood vessel caused by an arterial venous malformation, an abnormal tangle of blood vessels. Two days later, on Friday, June 20th, subsequent to an electroencephalogram, an EEG., that revealed no brain activity, Hebert’s life support mechanisms were disconnected and he died.
Hebert, on the occasion of his injury, was working with Baron James Dooley, a co-employee who had been hired at the same time. Dooley testified that he and Hebert worked outdoors in both the morning and afternoon of the Wednesday in question and that it was a very hot, humid day with the temperature hovering between ninety-five and ninety-eight degrees. Dooley stated that in the morning he, Hebert and their helpers ran approximately 400 yards of PVC pipe. They placed the sections of the pipe, each weighing approximately eight pounds, end to end along a fence and then glued them together.
Hebert’s afternoon responsibilities consisted of fabricating tables with the assistance of Dooley and three helpers. Heavy metal plates measuring approximately eight feet by twenty feet were moved by a cherry picker to the work site, a roofed structure with three sides. The plates were placed on four by fours, measured and, with the use of a torch, cut to the necessary size. After the plates were cut they weighed between 300 and 400 pounds each and were carried by the five workers into the fabrication shop where legs were attached.
*1214 Hebert complained to Dooley of a severe headache at about 4:20 p.m., just as the final leg was being attached to the fourth metal plate. Dooley suggested that he take a break and get an aspirin. When Hebert returned, apparently having sought an aspirin, Dooley noticed that he looked as if he was feeling worse than before he left. Dooley stated that he saw Hebert stumble when he walked and that he saw Hebert enter an enclosed incompleted office.
Dooley testified that shortly after Hebert’s return to the fabrication shop he went to check on him. When Dooley entered the incompleted office, he saw Hebert lying on a board. He stated that the room was extremely hot and that Hebert was sweating profusely. Dooley attempted to speak to Hebert, but Hebert was unable to communicate except to mumble. Dooley then called for assistance and moved Hebert outside into a cooler shaded area. Eventually Hebert was transported to Dau-terive Hospital and then to Lafayette General Hospital where he died two days later.
Jeffery F. Strassel, a safety engineer with Harbert testified that late Wednesday afternoon he was summoned to the fabrication shop by Hebert’s co-workers. When he arrived he found Hebert lying down in a small incomplete office. He stated that Hebert’s clothes were soaking wet, that he was sweating profusely, had a clammy texture and appeared to be in a stupor. Stras-sel did state, however, that Hebert was able to tell him that he was not feeling well and that his head hurt.
David Bourgeois, another Harbert employee who was at the fabrication shop when Hebert fell ill was not called to testify. The parties, for the purpose of convenience, stipulated that Bourgeois’ testimony would have been the same as Strassel’s.
The issues on appeal both address the question of whether the Trial Judge correctly applied the law to the facts. The law, La.R.S. 23:1031, (1950) provides, in part:
If an employee not otherwise eliminated from the benefits of this Chapter, receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation in the amounts, on the conditions, and to the person or persons hereinafter designated. (Emphasis added).
The Trial Court concluded, and the parties agreed, that Hebert died as the result of a “personal injury by accident ... in the course of his employment_” R.S. 23:1031, supra. Cerebral vascular “accidents”, as this decedent experienced, have been interpreted to fall within the ambit of a “personal injury by accident”. Reid v. Gamb, Inc., 509 So.2d 995 (La.1987); Leleux v. Lumbermen’s Mutual Insurance Company, 318 So.2d 15 (La.1975); Lonzo v. Town of Marksville, 430 So.2d 1088 (La.App. 3rd Cir.1983), writ denied, 438 So.2d 576 (La.1983). The jurisprudence also reveals that an accident occurs in the course of one’s employment “when it happens during the time of employment and at a place contemplated by the employment.” Reid, supra, at 996; Michaleski v. Western Preferred Casualty Company, 472 So.2d 18 (La.1985); Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626 (La.1982). Hebert sustained his injury while on the job at the site assigned by his employer.
Disagreement in this suit arises over the Trial Court’s conclusion that Hebert’s injury arose out of his employment activities with Harbert. Harbert and U.S.F. & G. suggest that Hebert’s accident did not arise out of his employment and that his family is, therefore, not entitled to worker’s compensation death benefits.
The “arising out of” element of R.S. 23:1031 contemplates that injured workers and, in this instance, their families are entitled to receive compensation benefits for injuries “causally related to the employment and fairly part of the employer’s cost of business.” Reid, supra, at 996; Nix v. City of Houma, 488 So.2d 184 (La.1986); Adams v. New Orleans Public Service, Inc., 418 So.2d 485 (La.1982); Guidry, supra. The formula adopted for determining when a cerebral vascular accident arises out of a worker’s employment is the same as applied to cardiovascular accidents. The Guidry Court addressing cardiovascular *1215 accidents held that a compensation claimant’s burden is to prove by a preponderance of the evidence that a causal link exists between the employment and the injury. See also, Primm v. City of Shreveport, 297 So.2d 421 (La.1974). The claimant must establish that “the work effort, stress or strain in reasonable probability contributed in some degree to the heart attack” or as regards the instant case, the cerebral vascular accident. Guidry, supra, at 633.
The Reid Court addressing the possibility that the worker’s injury may have resulted from a preexisting condition, stated:
[I]f the employee has a preexisting weakness or condition that predisposes him to a cerebral vascular accident, the claimant should be required to prove that the employment acting on the preexisting condition was a degree greater than that generated in everyday non-employment life. Reid, supra, at 998.
The Court in Reid followed the earlier Gui-dry decision which held:
[I]f the activities in which the worker with a preexisting heart disease is engaged, ... entail exertion, stress or strain greater than would be involved in every day non-employment life and he experiences a heart attack, he has made a prima facie showing that the accident arose out of or was connected with, the employment. Guidry, supra, at 633.
The Guidry Court specifically noted that the standard did not, however, relieve the claimant of the “necessity of presenting evidence of medical causation.” Guidry, supra, at 633, n. 16.
The testimony of Hebert’s co-workers and the stipulation of the parties strongly suggests that the decedent’s work activities entailed greater exertion, stress and strain than everyday nonemployment life. The testimony reveals that the day Hebert fell ill was a typical summer day in south Louisiana. The temperature hovered between ninety-five and ninety-eight degrees and it was very humid. Although the evidence indicates that Hebert’s work was not very demanding, when the heat, humidity and duration of his workday are taken into consideration, we believe it is evident that he was engaged in activities which exacted greater exertion, stress and strain than everyday nonemployment life.
The medical evidence also strongly indicates that Hebert’s injury arose out of his employment activities. Testifying either at trial or by way of their depositions were: (1) Dr. Timothy F. Himel, an emergency room physician at Dauterive Hospital; (2) Dr. Ricardo Leoni, the neurosurgeon who attended Hebert at Lafayette General Hospital; (3) Dr. Stephen James Ritter, an internist who examined the decedent on the day he fell ill; (4) Dr. James Domingue, the physician who performed the EEG.; and (5) Dr. William Albert Martin, a physician who reviewed Hebert’s medical records.
Doctor Himel testified that upon Hebert’s admission into the hospital a CT scan was made which revealed a massive hem-morhage in the left frontal section of his brain. Hebert’s condition was diagnosed as an intracranial hemmorhage which could have been caused by stress or exertion. The doctor stated that based upon his knowledge of Hebert’s symptoms, a severe headache and changes in blood pressure or pulse, the hemmorhage probably occurred within minutes of the onset of the symptoms. Doctor Himel, while acknowledging that aneurysms have been known to rupture at all times, stated that stress is often a precipitating factor.
Doctor Leoni concluded that Hebert’s death was the result of a left frontal intra-cerebral clot. He was of the opinion that the clot was secondary to either a ruptured aneurysm or an arterial venous malformation. Doctor Leoni indicated that if Hebert’s work activities were not the sole cause of his death it was, at the very least, a precipitating cause which acted upon a preexisting condition.
Doctor Ritter, while not venturing an opinion as to the exact cause of Hebert’s death and in general deferring to Doctor Leoni’s opinion, did state that Hebert’s work environment on the day he fell ill could have contributed to his demise. Doctor Ritter’s examination of the decedent eliminated the possibility of death having *1216 resulted from heat prostration or exhaustion. The Doctor did state that he believed Hebert had suffered an acute intracerebral event and that he was surprised because Hebert was in his early thirties.
Doctor Domingue’s testimony did not provide any insight into Hebert’s death. Doctor Domingue’s only involvement in Hebert’s care was the performance of the EEG. which revealed no brain activity.
The last doctor to render an opinion as to the cause of Hebert’s death was Doctor Martin. Doctor Martin, testifying on behalf of the defense, did not testify from any personal examinations of the decedent but, rather, solely from a review of Hebert’s medical records. Doctor Martin believed that Hebert suffered an intracere-bral hematoma which ruptured into the ventricular system causing an irreversible coma. He stated that he could draw no connection between the decedent’s employment on June 18th and his death. Doctor Martin speculated that the hematoma could have been the result of an aneurysm, an arterial venous malformation or, even more remotely, a tumor. The Doctor specifically stated that the medical statistics pertaining to aneurysms indicate that they may rupture at any time, including during sleep. Doctor Martin was of the opinion that the medical statistics prevented him from drawing any conclusion that Hebert’s work on the day he fell ill contributed to his death.
Subsequent to our review of the medical evidence, we do not believe the Trial Court erred. The plaintiff established that Hebert’s death arose out of his employment activities.
For the above and foregoing reasons, the judgment of the District Court in favor of Sally Migues Hebert, individually, and on behalf of Brett Hebert and Nicole Hebert, her minor children, and against Harbert International, Inc. and United States Fidelity & Guaranty Insurance Company is affirmed.
All costs of this appeal are assessed against Harbert International, Inc. and United States Fidelity & Guaranty Insurance Company.

AFFIRMED.

. La.R.S. 23:1231.
For injury causing death within two years after the accident, there shall be paid to the legal dependents of the employee, actually and wholly dependent upon his earnings for support at the time of the accident and death, a weekly sum as hereinafter provided. If the employee leaves legal dependents only partially dependent upon his earnings for support at the time of the accident and death, the weekly compensation to be paid shall be equal to the same proportion of the weekly payments for the benefit of persons wholly dependent as the amount contributed by the employee to such partial dependents in the year prior to his death bears to the earnings of the deceased at the time of the accident.
However, if the employee leaves no legal dependents, the sume of twenty thousand dollars shall be paid to each surviving parent of the deceased employee, in a lump sum, which shall constitute the sole and exclusive compensation in such cases.

. La.R.S. 23:1232.
Payment to dependents shall be computed and divided among them on the following basis:
(1) If the widow or widower alone, thirty-two and one-half per centum of wages.
(2) If the widow or widower and one child, forty-six and one-quarter per centum of wages.
(3) If the widow or widower and two or more children, sixty-flve per centum of wages.
(4) If one child alone, thirty-two and one-half per centum of wages of deceased.
(5) If two children, forty-six and one-quarter per centum of wages.
(6) If three or more children, sixty-five per centum of wages.
(7) If there are neither widow, widower, nor child, then to the father or mother, thirty-two and one-half per centum of wages of the deceased. If there are both father and mother, sixty-five per centum of wages.
(8) If there are neither widow, widower, nor child, nor dependent parent entitled to compensation, then to one brother or sister, thirty-two and one-half per centum of wages with eleven per centum additional for each brother or sister in excess of one. If other dependents than those enumerated, thirty-two and one-half per centum of wages for one, and eleven per centum additional for each such dependent in excess of one, subject to a maximum of sixty-five per centum of wages for all, regardless of the number of dependents.

.La.R.S. 23:1233.
Weekly payments to a surviving spouse shall continue until the death or remarriage of such surviving spouse. In the case of remarriage of a surviving spouse, two years compensation payments shall be payable in one lump sum.
Weekly payments to a surviving child, physically or mentally incapacitated from earning, *1213 shall continue as long as such incapacity exists.
Weekly payments to a minor dependent child, who is not mentally or physically incapable of wage earning, shall terminate when he dies, marries, reaches the age of eighteen years, or, if enrolled and attending as a full-time student in any accredited educational institution, until he ceases to be so enrolled and attending or reaches the age of twenty-three years.
Weekly payments for all other dependents as determined in Subpart D of the Chapter shall continue as long as their dependency shall exist or shall terminate upon their deaths.